**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| INDIANA REGIONAL COUNCIL OF ) | | |
| CARPENTERS PENSION TRUST FUND, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | No. 2:06-CV-32 PS | |
| ) | | |
| FIDELITY & DEPOSIT COMPANY ) | | |
| OF MARYLAND, ) | | |
| ) | | |
| Defendant. ) | | |

## OPINION AND ORDER

Gerry Nannenga, a trustee for a pension fund, received a large kickback from a real estate agent to vote in favor of using fund assets to buy a parcel of property for a wildly inflated amount. Nannenga and the real estate agent profited handsomely, but only in the short term. Eventually, they both landed in the clink. Meanwhile, the fund took it on the chin, or at least that's the allegation. Plaintiff Indiana Regional Council of Carpenters Pension Trust Fund ("the Fund") had a bond to protect it from criminal conduct involving fiduciaries like Nannenga. But when the Fund submitted its claim to the bonding company, Fidelity & Deposit Company of Maryland ("F&D"), it refused to pay, and this lawsuit followed.

Before the Court are the parties' motions for partial summary judgment. [Docket Nos. 21, 32.] The issue is whether the Fund brought this lawsuit in a timely way. F&D asserts that the two-year limitations provision in the bond bars the Fund's breach of contract claim as a matter of law. However, because the bond at issue is an "official bond," Indiana law renders void the suit limitations clause in the policy. The lawsuit was therefore timely brought. In any

event, questions of fact abound on whether F&D waived its right to assert the policy limitations defense. The Court therefore **DENIES** Defendant's motion for partial summary judgment and **GRANTS** Plaintiff's cross-motion for summary judgment on Defendant's second affirmative defense.

## I.  FACTUAL BACKGROUND

### The Fund's Policy With F&D

The Fund is an "employee pension benefit plan" under ERISA. (Pl.'s Ex. 1 ¶ 3.) As such, it was required by ERISA to carry a fidelity bond to protect against acts of dishonesty and fraud by its fiduciaries. 29 U.S.C. § 1112(a). To comply with ERISA requirements, the Fund purchased a commercial crime policy from F&D for the policy period June 1, 2003 to June 1, 2004, and it held this policy or a substantially identical policy with F&D from the period of June 1, 1998 through June 1, 2004. (*Id.* ¶ 4; Pl.'s Ex. 3 ¶ 6.) The 2003-2004 policy was executed in Indiana. (*Id.* ¶¶ 5-7; Pl.'s Ex. 2; Def.'s Ex. 3(A).[1]) The policy contained a two-year limitations period on legal actions against F&D that runs from the date the claimed loss is discovered. (Def.'s Ex. 3(A) at 6.)

### Nannenga's Fraud

In October 1998, the Fund voted by a 5-3 count to invest ten million dollars for 55 acres of land in Chesterton, Indiana, in a real estate development known as Coffee Creek. (Pl.'s Ex. 3 ¶ 13.) The parcel was worth nowhere near that amount of money. Gerry Nannenga, a trustee of the fund and its secretary, was paid a large kickback in exchange for his vote in favor of the

---

[1] For the sake of clarity, the Court adheres to Plaintiff's designation of Defendant's Exhibit 3, as discussed in Plaintiff's Response at n.1.

2

investment and his encouragement of other Board members to support the investment. (Pl.'s Ex. 4 at 15-22.) The investment closed in March 1999. (Pl.'s Ex. 3 ¶ 17.) In June 2003, Nannenga took another job and thus resigned his position as Trustee and Secretary. (Pl.'s Ex. 6.) On September 5, 2003, Nannenga was indicted by a federal grand jury on bribery and conspiracy charges. (Def.'s Ex. 3(B)(E).) The indictment alleged that Nannenga "agreed to receive and solicited payments . . . for the Pension Fund's decision to invest Pension Fund assets in Coffee Creek." (*Id.* ¶ 24.) It also alleged that the Fund "ultimately purchased 55 acres of vacant land in Coffee Creek for approximately $10 million despite a report presented to the Board of Trustees indicating that the land was valued at far less than the purchase price." (*Id.* ¶ 16.)

On November 17, 2003, Nannenga pled guilty. (Def.'s Ex. 3(B)(F).) Plaintiff filed a complaint in federal court against Nannenga on December 23, 2003, alleging that Nannenga had breached his fiduciary duties to the Fund, committed fraud, and violated RICO. (Def.'s Ex. 2.) In its prayer for relief, the Fund demanded "any overpayment (plus interest)" on its purchase of the 55 acres in Coffee Creek, and "any lost investment income (plus interest) which occurred as a result of Defendant's breach of fiduciary obligations to the Fund." (*Id.* at 12.)

**The Fund's Submission Of The Claim To F&D**

Between April and July, 2004, Plaintiff obtained appraisals of the Coffee Creek investment that show that the 55 acres bought by the Fund were worth substantially less than what the Fund paid for them. (Def.'s Ex. 3(B)(A)-(C).) On October 27, 2004, a representative of the Fund gave notice to F&D of a claim under its policy relating to Nannenga's fraud. (Pl.'s Ex. 3 ¶ 29; Pl.'s Ex. 7.) In response, F&D sent a proof of loss form. (Pl.'s Ex. 3 ¶ 30.) The Fund submitted the proof of loss form in January, 2005. (*Id.* at 31.)

3

Six months passed with no word from F&D, so on June 16, 2005, the Fund's attorney, Marion Adler, called F&D claims representative Steven Hauck to inquire about the status of the claim. (Pl.'s Ex. 9 ¶ 3.) Hauck told Adler that F&D had not progressed very far in processing the claim, and that the investigation was ongoing. (*Id.*) According to Adler, F&D had not undertaken any investigation of the claim by the June 16th telephone call, and that F&D actually began investigating the claim on August 15, 2005. Even then, the investigation was relatively superficial. (*Id.* ¶ 5.)

The Fund still heard nothing from F&D for another five months, so on November 10, 2005, Adler left a voicemail for Hauck and sent a follow-up letter. (*Id.* ¶ 6-7.) The next day, Julia Gelinas, F&D's outside counsel, returned Adler's call to Hauck. (Pl.'s Ex. 3 ¶ 33.) Gelinas informed Adler that Hauck was no longer handling the claim, and that the claim had been reassigned to another claims representative. (*Id.*) Adler asked Gelinas for a commitment that F&D would respond to the claim within a week – by November 18, 2005. (Pl.'s Ex. 9 ¶ 8.) Gelinas responded that she did not believe that was feasible, but offered instead to contact Adler the following week and commit then to a date certain for F&D to respond to the claim. (*Id.*) Gelinas called Adler on November 16th and left a voicemail stating that F&D would try to respond to the claim by December 2, 2005. (Pl.'s Ex. 3 ¶ 38.)

On December 2, 2005, F&D issued a letter denying the claim. (Pl.'s Ex. 14.) F&D asserted that the policy's provision on "employee theft" did not cover the kickback scheme at issue. (*Id.*) It also asserted that the Fund waited an unreasonable amount of time before giving notice of the claim to F&D, in breach of the "notice" and "proof of loss" provisions of the policy. (*Id.*) Adler claims that F&D's reading of the "employee theft" provision was such a

4

"blatant misinterpretation of the policy's scope of coverage" that she concluded that F&D must have rushed its preparation of its response in order to meet the December 2 deadline, and thereby misread the policy.  (Pl.'s Ex. 12.)  Adler responded with a letter to Gelinas on December 19, 2005 and asked for a response by January 9, 2006, accounting for the Christmas and New Year's holidays.  (Pl's Ex. 15; Pl's Ex. 9 ¶ 13.)  On January 6, 2006, Gelinas sent Adler an email requesting an extension of the deadline because of a death in the family of F&D's internal claims representative.  (Pl's Ex. 3 ¶ 41.)  Adler agreed to an extension of one week.  (*Id*.)

On January 17, 2006, F&D sent its second denial letter.  (Pl.'s Ex. 17.)  It repeated one of the earlier grounds for denial – that Plaintiff delayed giving F&D notice of its claim.  (*Id*.)  But it also denied the claim on the grounds that the Fund's loss did not "result directly" from employee dishonesty as required by the policy.  (*Id*.)  The Fund filed this lawsuit ten days later, on January 27, 2006.

F&D took virtually no discovery and instead filed the present motion for partial summary judgment, asserting that Plaintiff's breach of contract claim is barred by the policy's two-year suit limitations clause.  The Fund cross-moved for summary judgment, arguing that the contractual period of limitations in the policy is invalid under Indiana law, and that, in any event, issues of fact preclude summary judgment for Defendant.

## II.  DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  Summary judgment may be sought "as to all or any part

5

of" the claim at issue.  FED. R. CIV. P. 56(a).  A genuine issue of material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The Court must draw every reasonable inference from the record in the light most favorable to the non-moving party.  *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999).

      F&D claims that the Fund was tardy in bringing this lawsuit.  F&D directs the Court to language of the policy which requires that legal action be brought against F&D within 2 years from the date the Fund discovers the loss. (Def.'s Ex. 3(A) at 7.)  Under the policy, "[d]iscovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this policy has been or will be incurred, even though the exact amount or details of loss may not then be known." (*Id.* at 5-6.)  The limitations clause of the policy goes on to provide:  "If any limitation is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law." (*Id.* at 6.)  F&D argues that more than two years elapsed from the time that the Fund discovered its loss to the time it filed suit against F&D, even if the Court were to assume that the Fund did not discover its loss until it filed its lawsuit against Nannenga on December 23, 2003.

      The Fund, in turn, argues that Indiana law prohibits this limitations clause, such that the statutory limitations period for contract actions generally should apply.  In the alternative, the Fund argues that questions of fact exist regarding 1) when it discovered its loss, and 2) whether F&D waived the contractual limitation through its conduct.

6

### A. Enforceability of the Two-Year Limitations Provision in the Policy

ERISA does not preempt state law bearing on the validity of an ERISA-mandated bond. Rather, ERISA regulations specifically provide that "[a] bond shall not be adequate to meet the requirements of section 13, if, with respect to bonding coverage required under section 13, it contains a clause, or is otherwise, in contravention of the law of the State in which it is executed." 29 C.F.R. § 2580.412-19(c); *see also Employers-Shopmens Local 516 Pension Trust v. Travelers Cas. & Surety of Am.*, No. 05-444-KI, 2005 WL 1653629, at **5-6 (D. Or. July 6, 2005) (remanding pension trusts' action against insurers on ERISA-compliant fidelity bonds for lack of subject matter jurisdiction; ERISA did not preempt pension trusts' common law claims, and diversity jurisdiction did not exist).[2] Since the parties apparently agree that the bond was executed in Indiana, the Court is required to determine whether the suit limitations clause in this case violates Indiana law. Following the Indiana Supreme Court's decision in *U.S. Fid. & Guar. Co. v. Poetker*, 102 N.E. 372 (Ind. 1913), and subsequent interpretations of that case, the Court concludes that it does.

Generally, in Indiana, "contractual limitations on the bringing of actions, such as that involved here, are valid, although not a favorite of the law." *Huff v. Travelers Indem. Co.*, 363 N.E.2d 985, 991 (Ind. 1977); *see also Caywood v. Supreme Lodge of Knights & Ladies of Honor*, 86 N.E. 482, 483 (Ind. 1908). In this case, the contractual limitation arises in what Plaintiff alleges is an "official bond." Indiana courts (and courts applying Indiana law) have

---

[2] It is worth noting that if this were a suit under ERISA instead of a lawsuit filed under the Court's diversity jurisdiction, a different outcome would obtain. The Seventh Circuit has concluded that contractual limitations "if reasonable are enforceable in suits under ERISA, regardless of state law" forbidding such limitations. *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 873 (7th Cir. 1997).

7

historically construed official bonds even more strictly against the surety than private bonds or insurance contracts, presumably because they protect the public, rather than private parties, from fraud.  63C Am. Jur. 2d Public Officers and Employees § 130 (Westlaw 2006), citing *State v. Lidster*, 467 N.E.2d 47, 49 (Ind. Ct. App. 1984).

In *Poetker*, the Indiana Supreme Court dealt with a bond issued by the surety, United Fidelity & Guaranty Co., to the cashier of the People's State Bank, promising to reimburse the bank for any loss caused by the cashier's fraud or dishonesty.  *Poetker*, 102 N.E. at 373.  The bond was executed in compliance with Indiana banking law.  The surety argued that the lower court should have enforced various contractual provisions tending to limit its liability (including a 12-month suit limitations clause).  The Supreme Court held that it would violate statutory law and public policy to allow the parties to contract around the statutes requiring the bond.  The Court relied on Indiana Code § 1278 (Burns 1908), which provided:

> No official bond entered into by any officer, nor any bond, recognizance, or written undertaking taken by any officer in the discharge of the duties of his office, shall be void for want of form or substance or recital or condition, nor the principal or surety be discharged; but the principal and surety shall be bound by such bond, recognizance, or written undertaking to the full extent contemplated by the law requiring the same, and the sureties to the amount specified in the bond or recognizance.  In all actions on a defective bond, recognizance or written undertaking, the plaintiff or relator may suggest the defect in his complaint, and recover to the same extend as if such bond, recognizance, or written undertaking were perfect in all respects.

8

*Poetker*, 102 N.E. at 375.  The successor statutes to § 1278 – although modernized some – contain virtually identical language.[3]

The Seventh Circuit subsequently analyzed *Poetker* in *Hack v. American Sur. Co. of N.Y.*, 96 F.2d 939 (7th Cir. 1938), a case which also involved malfeasance by bank officers.  The court concluded that the bond was issued pursuant to statute, and therefore, was an "official bond."  *Id*. at 942.  The court specifically held that *Poetker*'s strict reading of bond provisions to conform with statutory provisions also required conformity with the applicable statute of limitations:

> We are convinced that [*Poetker* and the official bonds statute] should be construed so as to hold the bond therein referred to (and the bond before us) as statutory official bonds, and as such, the statute, rather than the restricted written contract of the parties, measures the liability of the surety.  Regardless of its language it covered dishonest and unfaithful discharge of officers' duties.  This also applies to the efforts of said surety to restrict its said liability by fixing a time limit within which an action must be instituted.  ***The Indiana statute of limitations, not the shorter period specified in the contract, must govern the time within which [an] action shall be brought or barred.***

---

[3] *See* Ind. Code § 34-49-2-1:  "An official bond entered into by any officer, or any bond, recognizance, or written undertaking taken by any officer in the discharge of the duties of the officer's office, is not void for want of form or substance, recital or condition."

Ind. Code § 34-49-2-2:

The principal or surety will not be discharged because of any defects listed in section (1) of this chapter.  The principal and surety shall be bound by the bond, recognizance, or written undertaking, to the full extent contemplated by the law requiring the bond, recognizance, or written undertaking.  The sureties shall be bound to the amount specified in the bond or recognizance.

Ind. Code § 34-49-2-3:  "In all actions on a defective bond, recognizance, or written undertaking, the plaintiff or relator may suggest the defect in the plaintiff's or relator's complaint, and recover to the same extent as if the bond, recognizance, or written undertaking were perfect in all respects."

*Id.* (footnote and citations omitted) (emphasis added). Although *Hack* is nearly seventy years old, it is squarely on point, and we are, of course, bound by it.

Moreover, long after *Poetker* and *Hack* were decided, they were interpreted by the Indiana Court of Appeals in *State v. Lidster*, 467 N.E.2d 47, 49 (Ind. Ct. App. 1984). *Lidster* read *Poetker* as holding that "provisions in official bonds which tend to limit or restrict the surety's liability are void." *Id.*, citing *Poetker*, 102 N.E. at 376 (internal citations omitted). Citing *Hack*, the court stated, "Each of the bonds at issue here contain provisions which relieve the sureties of liability if claims are not brought within three years after the occurrence of the wrongdoing. ***In as much as these provisions shorten the applicable statute of limitations they are void.***" 467 N.E.2d at 49 (emphasis added) (citing *Hack*, 96 F.2d at 944).

Defendant argues that the limitations clause in the commercial crime policy is valid because it does not violate any of the particular statutory provisions requiring the bond. In Defendant's view, a limitations clause in an official bond is only void if it "contravenes a specific statutory requirement." (Def.'s Reply at 3); *see also Poetker*, 102 N.E. at 374 ("[W]hen a bond is given in obedience to a command of the statute, a construction shall be given it which binds the obligors to the performance of the conditions which the statute declares it shall contain."); *In re Kemper Ins. Cos.*, 819 N.E.2d 485, 491 (Ind. Ct. App. 2004) ("[A] surety has a right to stand upon the terms of the bond as written and, aside from the required statutory conditions which may be read into a bond, the court has no power to add other conditions to those fixed by statute." (internal citations and quotations omitted)). Defendant insists that because the policy complies with federal regulations requiring employee benefit plans to be bonded (*see* 29 C.F.R. § 2580.412 et seq.), and because those regulations say nothing about a

10

statute of limitations, the limitations clause in the policy is lawful.

But Defendant's arguments fail to fully grapple with the *Poetker/Hack/Lidster* trilogy. Those cases conclude (whether indirectly or directly) that the applicable statute of limitations *is* part of the statutory framework to which the terms of the bond must conform, and that a limitations clause is repugnant to that framework. Defendant attempts to distinguish *Lidster* on the grounds that the limitations clause in the bond in that case contravened a statute of limitations that specifically discussed suits against public officers, whereas here, the only statutes of limitation pointed to by Plaintiff relate generally to actions brought on contracts. But *Lidster* did not make that distinction; it takes the broadest view of *Poetker* in concluding that *any provision tending to limit the surety's liability* is void.  467 N.E.2d at 49.  In any event, *Hack* held directly that the limitations clause in that case was void because it contravened the general statute of limitations applying to foreign corporations.  96 F.2d at 944.  At oral argument, counsel could not distinguish *Hack* from the case at bar, and neither can we.

It could be argued that fiduciaries of an employee benefit plan are not "public officials," and therefore this bond is not an "official bond."[4]  But this is not supported by Indiana law – after all, *Poetker* and *Hack* dealt with officers of a private bank, not public officials.  Although it is intuitive to think that the term "official bond" should be limited to those bonds taken by public officials, Indiana courts have taken a broader view, holding that "[a] bond taken pursuant to the requirement of a statute is an official bond." *Southern Sur. Co. v. Kinney*, 127 N.E. 575, 578

---

[4] As Defendant points out, ERISA regulations explicitly state that the "bond required under section 13 . . . is not required to provide the same scope of coverage that is required . . . in the faithful performance bonds of public officials." 29 C.F.R. § 2580.412-8.

(Ind. Ct. App. 1920) (citing *Poetker*); *see also Schindler Elevator Corp. v. Metro. Dev. Com'n*, 641 N.E.2d 653, 663 (Ind. Ct. App. 1994) (citations omitted) (statutorily required bond taken by bidders on public work projects was an "official bond").  Defendant essentially concedes that the commercial crime policy at issue is an "official bond" under Indiana law.

Perhaps another way to distinguish the *Poetker*/*Hack*/*Lidster* line of cases would be to argue that those cases are confined to official bonds mandated by *state* law, whereas here, the bond is mandated by federal law.  The Court's research has not disclosed a case applying these holdings to a federally mandated bond.  However, it is not clear why a federally mandated bond should be treated differently under Indiana law, particularly when the regulatory framework explicitly envisions that state law will bear upon the validity and adequacy of the bond.  *See* 29 C.F.R. § 2580.412-19(c).

In summary, the Court is constrained by the Indiana Supreme Court's decision in *Poetker*, which remains good law.  *Poetker*'s holding relied at least in part upon a provision of the Indiana Code which is still valid.  *See* Ind. Code §§ 34-49-2-1 through 34-49-2-3.  The Court must also follow the Seventh Circuit's decision in *Hack*, which is even more factually similar to this case than *Poetker*.  *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) (Seventh Circuit's interpretation of state law is binding on district courts within the circuit).  *Poetker* and *Hack* are not only binding precedent on this Court, they are also more factually similar to this case than the more recent – and more general – Indiana Court of Appeals decisions cited by Defendant.

In sum, this case is governed by the general statute of limitations addressing contract claims, which this lawsuit was brought well within.  Accordingly, Plaintiff's motion for partial

12

summary judgment as to the affirmative defense on the contractual period of limitations is granted.

### B. Questions of Fact Remain on the Issues of Discovery and Waiver

Even if we are incorrect on our reading of *Poetker* and *Hack,* and the two-year limitations provision in the policy is what governs in this case, there are still questions of fact regarding whether F&D waived its rights to enforce the limitations provision. An insurer can waive its right to rely on a policy limitation if the actions of the insurer cause "the insured or claimant under the policy to delay bringing suit until after the time provided for under the policy." *Huff v. Travelers Indem. Co.*, 363 N.E.2d 985, 991 (Ind. 1977) (citation omitted). The purpose behind the waiver doctrine is to discourage an insurer from lulling an insured into believing that the limitations provision will not be relied upon and then – once the clock has run out – denying liability on that basis. *Id.* at 992.

Assuming for the moment that the Fund discovered its loss by September 2003 when Nannenga was indicted (as Defendant suggests it may have), nearly two years would have elapsed before F&D even began investigating the claim. We know this because the Fund has adduced evidence that F&D did precisely nothing for eight months after it received the proof of loss in January 2005. When it did begin to investigate, F&D conducted only a cursory investigation. (Pl.'s Ex. 10 Int. Ans. 2 & 4; Pl.'s Ex. 11.) What's more, once the claim was being investigated in earnest – some three months later – more foot-dragging occurred. On November 11, 2005, counsel for F&D informed counsel for the Fund that the claim had been reassigned to a different claims representative, and stated that she did not believe the claim could be responded to by November 18, 2005. (Pl.'s Ex. 9 ¶ 8.) On November 16, 2005, counsel for

13

F&D told counsel for the Fund that F&D needed two more weeks to respond to the claim. (*Id*. ¶ 9.) And once the denial letter had been issued and then disputed by the Fund, counsel for F&D asked for an additional extension to respond to the Fund's dispute of the coverage decision. (*Id*. ¶ 14.) Therefore, a final coverage decision was not made until January 2006, and the Fund filed this lawsuit ten days later.

It's a little hard to swallow F&D's assertion of a limitations defense given that it repeatedly delayed acting on the claim. In the end, it is for the jury to decide whether F&D waived enforcement of the limitations clause. What is certain – when viewing the evidence in the light most favorable to the Fund – is that there are questions of fact in that regard. In the event that the Court's determination of summary judgment on the official bond issue is found by the Court of Appeals to be erroneous, a trial on the waiver issue would be necessary upon remand.

### III. CONCLUSION

For the foregoing reasons, Defendant Fidelity and Deposit Company of Maryland's Motion for Partial Summary Judgment [Docket No. 21] is **DENIED**, and Plaintiff Indiana Regional Council of Carpenters Pension Trust Fund's Cross-Motion for Partial Summary Judgment [Docket No. 32] is **GRANTED**.

**SO ORDERED.**

ENTERED:  March 2, 2007

                                                s/ Philip P. Simon
                                                PHILIP P. SIMON, JUDGE
                                                UNITED STATES DISTRICT COURT